## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Margarita Becerra,**

             **Plaintiff,**

v.                                            **Case No. 05-2022-JWL**

**EarthLink, Inc.,**

             **Defendant.**

### <u>MEMORANDUM AND ORDER</u>

Plaintiff filed suit against defendant, her former employer, alleging that defendant, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., failed to accommodate her disability, retaliated against her for engaging in protected activity and constructively discharged her. This matter is presently before the court on defendant's motion to dismiss and for summary judgment (doc. #64). As set forth in more detail below, the court grants defendant's motion in its entirety.

### I.      Facts

The following facts are undisputed or related in the light most favorable to plaintiff, the nonmoving party. Defendant EarthLink, Inc. is an internet service provider that provides a full range of access, hosting and e-commerce solutions to its customers over a nationwide network of dial-up points of presence, as well as high-speed access and wireless technologies. Plaintiff began her employment with defendant in August 2000 as a Process Manager in defendant's Pasadena, California office. In October 2001, defendant promoted plaintiff to the Business

Metrics (or Analysis) Manager position.   In this position, plaintiff began servicing Sprint, defendant's customer headquartered in Overland Park, Kansas.   Specifically, plaintiff worked with defendant's finance department to implement checks and balances in connection with the monthly billing reconciliation process with Sprint.   As the Business Metrics Manager, plaintiff reported directly to Jill Compton (defendant's Sprint Strategic Alliance Director) and Stephen Salinger (defendant's Director of Strategic Relations).   Ms. Compton was the head of plaintiff's work unit, defendant's "Sprint Team."

Defendant transferred plaintiff to defendant's Overland Park, Kansas office in April 2003. Plaintiff's transfer was initiated by plaintiff herself, who observed that her work with Sprint was more effective when she had face-to-face contact with Sprint employees in Overland Park.   Ms. Compton supported the move so that plaintiff could be closer to Sprint's personnel and also interface with defendant's Overland Park employees (*i.e.*, the Sprint Team) on a regular basis. Plaintiff's direct supervisor during the time she worked at the Overland Park office was Ms. Compton, who also worked in defendant's Overland Park office.   Shortly after plaintiff's transfer to the Overland Park office, the working relationship between plaintiff and Ms. Compton began to deteriorate.   In essence, Ms. Compton began counseling plaintiff concerning a variety of performance issues and plaintiff, in turn, believed that Ms. Compton was treating her and other employees in a condescending and rude manner and that Ms. Compton was emotionally abusive.

In February 2004, plaintiff requested a personal leave of absence from March 1, 2004 until March 31, 2004 for medical reasons.   The record reflects that Ms. Compton assisted plaintiff in obtaining approval for the leave request.   As the 30-day leave period was coming to an end,

2

plaintiff contacted defendant's human resources department to inquire about extending her leave beyond March 31, 2004.  Plaintiff was advised that if she did not return to work at the end of her leave period, defendant would start the process of terminating plaintiff's employment.  Plaintiff then contacted Ms. Compton for assistance and, ultimately, defendant agreed that an extension of plaintiff's leave would be appropriate, having then been advised that plaintiff's condition was likely fibromyalgia or rheumatoid arthritis, and offered her assistance in scheduling an appointment with a medical specialist.  Plaintiff's leave was extended through April 19, 2004.  On April 14, 2004, plaintiff informed Ms. Compton that she had been diagnosed with fibromyalgia and sent an e-mail to Ms. Compton generally explaining the condition.  Plaintiff's treating physician released plaintiff to return to work on April 19, 2004 and plaintiff did so.

During this time frame, defendant provided several accommodations requested by plaintiff. Plaintiff requested a lighter laptop computer on the grounds that her laptop at the time was heavy and aggravated her back.  Ms. Compton approved the request and defendant provided a lighter laptop to plaintiff.  Plaintiff also requested an ergonomic backpack to alleviate pressure on her back and the request was approved.  Ms. Compton also approved plaintiff's request to attend pool therapy sessions during working hours on Mondays and Wednesdays.  Defendant denied plaintiff's request for part-time employment on the grounds that there was "too much work to do" and that defendant did not have the available headcount to cover for plaintiff and it would be unable to find another individual with plaintiff's knowledge and skill-set who would be willing to work 10 to 20 hours per week.

In March 2004, during plaintiff's leave of absence, defendant adopted a company-wide cell

3

phone/mobile communications device policy.   In the policy, defendant set forth new criteria for the provision of mobile communication devices and service to its employees, specifically requiring Vice President approval and that employees receiving a mobile communication device and service from defendant must (1) be out of the office for at least twenty percent of their working hours, typically for business travel; (2) be required to be "on call" outside of business hours; or (3) hold a position that "consistently requires timely and business-critical two-way communications with no reasonable alternative."   The policy further stated that employees "who no longer require a cell phone or other communication device may have their current company-provided device transferred (including monthly service liability) to them."

Based on the criteria set forth in the policy, Ms. Compton informed plaintiff in May 2004 that her position did not require use of a cell phone or mobile communication device and that defendant would no longer provide her with cell phone and Blackberry service.   Plaintiff told Ms. Compton that her job required a cell phone and that she needed her Blackberry to "remember meetings and to be able to work more effectively" and to remind her to reply to e-mail messages. Plaintiff also told Ms. Compton that when her "stress increases with fibro, it is very difficult to remember things."   Ms. Compton told plaintiff to use her own cell phone and plaintiff turned in her defendant-issued cell phone and Blackberry.   Plaintiff retained the use of her defendant-issued laptop computer that she could use at home or at the office.   Thus, after turning in her cell phone and Blackberry, plaintiff used Microsoft Outlook's calendar function to remember appointments and meetings and had access to her e-mail through her computer at home.   Plaintiff did not complain to Ms. Compton or anyone in defendant's human resources department about the

decision to discontinue provision of a cell phone and Blackberry device to her and she never provided any medical certification that she required a cell phone or Blackberry as a reasonable accommodation for her medical condition.

On June 22, 2004, plaintiff and Ms. Compton had a conversation regarding Ms. Compton's ongoing frustrations with plaintiff's work performance and Ms. Compton concedes that she lost her temper and yelled at plaintiff during this meeting.[1]   Later that day, plaintiff complained via e-mail to Lynn Felgenhauer, one of defendant's human resources managers, about what she described as Ms. Compton's "harassment, hostility, intimidation, emotional, and verbal abuse." Plaintiff also advised Ms. Felgenhauer that her stress from dealing with Ms. Compton prevented her from "having any relief from the pain of fibromyalgia."   Plaintiff advised Ms. Felgenhauer that she wanted to meet with Mike Ihde, Ms. Compton's supervisor and defendant's Vice President of Strategic Sales Relationships.

Shortly thereafter, Ms. Felgenhauer advised Mr. Ihde of plaintiff's complaint.   Mr. Ihde's initial plan of action was to have plaintiff and Ms. Compton meet so that Ms. Compton could apologize to plaintiff for her behavior.   Utlimately, an in-person meeting among plaintiff, Mr. Ihde, Ms. Compton and Ms. Felgenhauer was scheduled for July 8, 2004.[2]   On June 30, 2004, plaintiff

---

[1]In fact, it is undisputed that Ms. Compton called her own supervisor, Mike Ihde, after the conversation with plaintiff and advised Mr. Ihde that she had handled the situation with plaintiff inappropriately and that she regretted the way in which she had treated plaintiff.  Mr. Ihde told Ms. Compton that if it happened again, her employment with defendant would be terminated.

[2]The meeting did not take place sooner than July 8, 2004 because of plaintiff's vacation schedule.

and Ms. Felgenhauer exchanged several e-mail messages in which Ms. Felgenhauer explained that the purpose of the July 8, 2004 meeting was to "broker a better working relationship" between plaintiff and Ms. Compton and to discuss both Ms. Compton's concerns about plaintiff's work performance and plaintiff's concerns about Ms. Compton's management style.

On July 8, 2004, plaintiff initially met with only Mr. Ihde and Ms. Felgenhauer outside the presence of Ms. Compton.   During this meeting, plaintiff stated for the first time that she no longer wanted to work with Ms. Compton but that she liked working for defendant and with Mr. Salinger.   Plaintiff restated her belief that the stress she experienced working with Ms. Compton was impacting her performance and making her medical condition worse.   Mr. Ihde and Ms. Felgenhauer offered plaintiff the options of reporting to someone other than Ms. Compton or separating her employment with defendant.   Mr. Ihde and Ms. Felgenhauer also met with Ms. Compton outside the presence of plaintiff.   During this meeting, Mr. Ihde advised Ms. Compton that the "yelling issue was a paramount concern" to him and that he hoped to reconcile any differences between plaintiff and Ms. Compton.   Ultimately, the four individuals met together and Mr. Ihde and Ms. Felgenhauer suggested that plaintiff and Ms. Compton undergo counseling to resolve their differences and improve their relationship.   During the meeting, the group also discussed other options to address the situation, including the option of providing plaintiff with a severance package and plaintiff's specific request to work from home.   Mr. Ihde stated to plaintiff that he would consider the options that they had discussed and then contact plaintiff.

On July 13, 2004, Ms. Felgenhauer, after consulting with Mr. Ihde, contacted plaintiff via e-mail to follow up on the options discussed at the July 8, 2004 meeting.   In this e-mail, Ms.

Felgenhauer offered plaintiff four options: (1) continuing in her same or similar role with Ms. Compton as her supervisor and working through their issues; (2) continuing in her same or similar role and reporting to someone else under Mr. Ihde, mostly likely Mr. Salinger; (3) seeking another position with defendant, likely involving a transfer to Atlanta, Georgia; or (4) accepting a severance package from defendant and signing a waiver and release agreement. Plaintiff quickly rejected the first and third options and, over the next two weeks, plaintiff and Ms. Felgenhauer exchanged several e-mails exploring the second and fourth options in more detail and, at plaintiff's request, Ms. Felgenhauer provided plaintiff with a sample waiver and release agreement.

Defendant did not offer plaintiff the option of working from home. According to defendant, Mr. Ihde had never authorized telecommuting and believed that such an arrangement would be problematic in a small office like defendant's Overland Park office because camaraderie and teamwork were important in order to service Sprint. Mr. Ihde also rejected the proposal because "it would just be disruptive" to allow one employee to work from home and not permit other employees to do the same. Ms. Compton and Ms. Felgenhauer concurred that plaintiff should not be permitted to work from home on a regular basis because of her job performance, which required her to be more closely monitored in the office, and the need for her to interact with her coworkers. According to Ms. Compton, plaintiff was not a self-starter and would not be proactive in communications or initiating projects regarding account reconciliation without supervision.

On July 28, 2004, Ms. Felgenhauer received a letter from plaintiff's counsel stating that she had advised plaintiff not to sign the waiver and release agreement. Plaintiff's counsel further

opined that defendant had failed to offer plaintiff a reasonable accommodation, created a hostile work environment and intentionally caused plaintiff emotional distress, and possibly caused plaintiff's fibromyalgia, by requiring plaintiff to work in the same office as Ms. Compton. Plaintiff's counsel proposed a monetary settlement of plaintiff's claims significantly greater than the standard severance package offered by defendant.

Ms. Felgenhauer sent an e-mail to plaintiff on August 2, 2004, advising that she had received the letter from her counsel, that she would be in touch soon to discuss the letter and that, in the meantime, plaintiff should continue with her normal responsibilities in the Overland Park office. During this time frame, plaintiff requested to work from Sprint's facility in Overland Park. Ms. Compton contacted Sprint to inquire about whether plaintiff could work from the Sprint facility; Sprint denied the request. Shortly thereafter, in the middle of August, Mr. Ihde permitted plaintiff to work from home on a temporary basis while the parties attempted to resolve plaintiff's concerns.

On August 19, 2004, defendant's assistant general counsel, Lawrence Slovensky, sent a letter to plaintiff's counsel in which he proposed that plaintiff report to Mr. Salinger or Joleen Fennell, a senior manager on the Sprint Team. Mr. Slovensky also offered the option of plaintiff accepting a severance commensurate with her service time with defendant and further stated that defendant remained willing to provide plaintiff and Ms. Compton with counseling to improve their working relationship. Mr. Slovensky stated that defendant was open to any other reasonable request from plaintiff. Finally, Mr. Slovensky stated that defendant had permitted plaintiff to work from home on a temporary basis while the parties attempted to resolve their dispute, but that

defendant needed a decision on the proposals and needed plaintiff to report back to the office to work by August 23, 2004.   After several telephone calls between the parties, plaintiff ultimately rejected defendant's proposals and advised defendant that she would not agree to any proposal in which she had to continue working in the same office as Ms. Compton but she was also unwilling to transfer to a different office.   Defendant did not meet plaintiff's demand and, instead, advised plaintiff to return to work on August 23, 2004, when she would begin reporting to Ms. Fennell. Plaintiff resigned her employment on August 23, 2004.


**II.      Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).   Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."   Fed. R. C`iv. P. 56(c).   In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.   *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).   An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."   *Id*. (citing *Anderson*, 477 U.S. at 248).

9

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.  *Id.* (citing Fed. R. Civ. P. 56(e)).  To accomplish this, sufficient evidence pertinent to the material issue  "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III.    Failure-to-Accommodate Claims

Plaintiff asserts that defendant failed to accommodate her fibromyalgia by refusing to provide her with a cell phone, Blackberry device and service and by refusing to allow her to work

from home.   Defendant moves for dismissal of plaintiff's claim that defendant refused to provide her with a cell phone and Blackberry on the grounds that the court lacks subject matter jurisdiction over this claim.   Defendant moves for summary judgment on plaintiff's claim that defendant refused to allow her to work from home on the grounds that plaintiff's presence in the office is an essential function of her job and her proposed accommodation is simply not reasonable within the meaning of the ADA.   As set forth in more detail below, the court grants defendant's motion in its entirety.

A.      *Plaintiff's Request for a Cell Phone and Blackberry Device*

        The court first addresses the threshold issue of whether it has subject matter jurisdiction over plaintiff's claim that defendant failed to accommodate her disability by refusing to provide a cell phone and Blackberry to her.   According to defendant, the court does not have subject matter jurisdiction over this claim because plaintiff failed to include this claim in her charge of discrimination and, thus, failed to exhaust her administrative remedies with respect to the claim. The court agrees with defendant and dismisses this claim for lack of subject matter jurisdiction. *See Shikles v. Sprint/United Management Co.*, 426 F.3d 1304, 1317-18 (10th Cir. 2005) (it is improper for a court to grant summary judgment to a defendant because of a lack of subject matter jurisdiction; proper disposition is to dismiss claims).[3]

---

        [3]In the alternative, defendant moves for summary judgment on plaintiff's claim that defendant failed to accommodate her disability by refusing to provide a cell phone and Blackberry to her.   According to defendant, the proposed accommodation would not have enabled plaintiff to perform the essential functions of her position.   The court declines to

It is well established that the ADA requires a plaintiff to exhaust his or her administrative remedies before filing suit. *See McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1105 (10th Cir. 2002). The Tenth Circuit has held that a plaintiff's exhaustion of his or her administrative remedies is a jurisdictional prerequisite to suit under the ADA–not merely a condition precedent to suit. *See id.* The court, then, lacks subject matter jurisdiction over ADA claims that are not part of a timely-filed EEOC charge. *See id.*; *Smith v. Park County Sch. Dist. No. 6*, 1999 WL 1136762, at *1 (10th Cir. Dec. 13, 1999).

It is undisputed that plaintiff did not allege in her charge of discrimination or her verified intake questionnaire that defendant failed to accommodate her by refusing to provide a cell phone or Blackberry. In fact, the only allegations raised by plaintiff at the administrative level in support of her failure to accommodate claim concern the "abusive office environment" in which defendant required plaintiff to work and plaintiff's request to work in a "different environment." Plaintiff urges that the court may still consider the merits of her Blackberry claim as it is "reasonably related" to the accommodation claim set forth at the administrative level. While the Tenth Circuit previously excused the exhaustion requirement for acts "reasonably related" to the acts included in the administrative charge, *see, e.g.*, *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 799 (10th

---

explore the merits of this claim as an alternative basis for judgment in favor of defendant. *See Staggs v. U.S. ex rel. Dept. of Health & Human Servs.*, 425 F.3d 881, 884 n.2 (10th Cir. 2005) (declining to address merits of claim as an alternative basis for affirmance where Circuit affirmed district court's decision that it lacked subject matter jurisdiction over claim) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 101-02 (1998) (rejecting the doctrine of hypothetical jurisdiction)).

Cir. 1997), that doctrine has been abrogated by more recent case law.[4]   As the Tenth Circuit explained in *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003), "unexhausted claims involving discrete employment actions are no longer viable" in light of the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Under *Morgan*, each discrete incident of discrimination constitutes a separate actionable unlawful employment practice and, thus, a plaintiff must exhaust his or her remedies with respect to each act.  *See id.* at 1210-11 ("The rule in *Morgan* requires a . . . plaintiff to exhaust administrative remedies for each individual discriminatory or retaliatory act.").

The question, then, is whether an employer's rejection of a proposed accommodation constitutes an "individual discriminatory act" or a "discrete incident of discrimination" for purposes of *Morgan*.   Two Circuit Courts of Appeals have addressed this issue in published opinions and both have concluded that an employer's rejection of a proposed accommodation is a discrete act that must be the subject of a charge of discrimination.  In *Elmenayer v. ABF Freight System, Inc.*, 318 F.3d 130 (2d Cir. 2003), the Second Circuit, looking to *Morgan*, held that an employer's rejection of an employee's proposed accommodation of his religious practices was

---

[4]As Judge Tacha succinctly explained in an unpublished opinion:

Prior to 2002, Tenth Circuit law allowed a party to include in a civil claim those acts that were "like or reasonably related to the allegation of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC." *Ingels*, 42 F.3d at 625.  Whatever the exact scope of that rule was, it is no longer the law.

*Tucker v. Colorado Dept. of Public Health & Env't*, 2004 WL 1632805 (10th Cir. July 22, 2004).

"the sort of 'discrete act' that must be the subject of a complaint to the EEOC within 300 days." *Id*. at 134-35.   Persuaded by the Second Circuit's opinion, the Ninth Circuit in *Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003) held that each of the employer's denials of an employee's requests for an accommodation for a disability under the Rehabilitation Act constitutes a discrete act of alleged discrimination requiring exhaustion of administrative remedies.   *Id.* at 1248.   The court believes that the Tenth Circuit, if faced with this issue, would readily agree with the Second and Ninth Circuit's resolution of the issue and would conclude that an employer's rejection of an employee's proposed accommodation is a discrete act that must be the subject of a charge of discrimination within 300 days of the employer's rejection.

Plaintiff, then, was required to raise at the administrative level her claim that defendant failed to provide her with a cell phone and Blackberry.   She has not done so, her claim is now time-barred and, thus, the court lacks subject matter jurisdiction over this claim.   *See Morgan*, 536 U.S. at 113 ("Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred.").

B.   *Plaintiff's Request to Work from Home*

Plaintiff also claims that defendant failed to accommodate her fibromyalgia by refusing to allow her to work from home on a permanent basis.   Defendant moves for summary judgment on this claim on the grounds that plaintiff's physical attendance in the Overland Park office was an

essential function of her job and her request to work from home was unreasonable.[5]  As explained below, the court agrees with defendant, concludes that plaintiff is not a "qualified individual with a disability" and grants summary judgment in favor of defendant.

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual."  *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004) (quoting 42 U.S.C. § 12112(a)).  Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee."  *Id.* (quoting 42 U.S.C. § 12112(b)(5)(A)). To establish a prima facie case of discrimination under the ADA, an employee must show: (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) she was discriminated against because of her disability.  *Id.* (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003)).  Defendant concedes that plaintiff is disabled under the ADA and, thus, the court proceeds directly to the question of whether plaintiff is qualified within the meaning of the ADA.  Under the second element of the ADA's prima facie case, the court employs a two-part analysis to determine whether an individual is qualified.  *Id.*  The court first determines

---

[5]Defendant also contends that it is entitled to summary judgment for a host of other reasons, including that plaintiff is precluded from recovering under the ADA because she abandoned the interactive process required by the ADA, because defendant offered and plaintiff rejected numerous reasonable accommodations and because the accommodation requested by plaintiff is not related to her physical or mental limitations.  The court declines to address the merits of these arguments in light of its conclusion that plaintiff otherwise fails to establish a prima facie case with respect to her failure-to-accommodate claim.

whether the individual can perform the essential functions of the job.  If the court concludes that the individual is unable to perform the essential functions of the job, the court then determines whether any reasonable accommodation by the employer would enable the individual to perform those functions. *Id*. (citing *Davidson*, 337 F.3d at 1190).

The plaintiff bears the burden of showing she is able to perform the essential functions of her job.  *Id*. at 1119 (citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002)).  "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires."  *Id.* (quoting 29 C.F.R. § 1630.2(n)(1)).  "Evidence considered in determining whether a particular function is essential includes: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the work experience of past incumbents in the job."  *Id*. (citing 29 C.F.R. § 1630.2(n)(3); *Wells v. Shalala*, 228 F.3d 1137, 1144 (10th Cir. 2000)).  With respect to the employer's judgment as to which functions are essential, the Circuit has cautioned that a district court must "not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity."  *Id*. (citing *Davidson*, 337 F.3d at 1191). The "essential function inquiry is not intended to second guess the employer or to require the employer to lower company standards."  *Id.* (quoting *Tate v. Farmland Indus., Inc*., 268 F.3d 989, 993 (10th Cir. 2001)).

In *Mason*, the Tenth Circuit recognized that physical attendance in the workplace is itself an essential function of most jobs.  The plaintiff in *Mason* worked as a service coordinator,

requiring her to schedule service appointments for technicians working in the field and, in turn, to communicate with various technicians by computer, telephone and fax. *Id.* at 1117. After certain stressors in the workplace triggered the plaintiff's post-traumatic stress disorder, plaintiff requested leave to work out of her home. *Id.* Her employer denied that request, contending that the plaintiff could not perform the service coordinator position from her home because physical attendance at the administration center was a function of her position. *Id.* at 1117-18. Ultimately, the plaintiff was discharged because she could not return to the workplace. *Id.* at 1118. She filed a lawsuit alleging that her employer violated the ADA by failing to accommodate her disability. *Id.* The district court granted summary judgment in favor of the employer, holding that physical attendance at the administration center was an essential function of the plaintiff's job and that her request to work from home was unreasonable. *Id.*

On appeal, the Tenth Circuit affirmed the district court's decision. After reviewing cases from other Circuits recognizing that attendance in the workplace is an essential function of most jobs, the Circuit reviewed the evidence presented by the parties, including the employer's evidence that the plaintiff's position required supervision and teamwork; that all of the employer's service coordinators worked their entire shifts at administration centers; that the employer had never permitted a service coordinator to work anywhere other than an administration center; and that service coordinators could not be adequately trained or supervised if they were not at the administration center. *Id.* at 1120. While the plaintiff presented her own testimony concerning the essential functions of her job based on her own experience, the Circuit held that such evidence was insufficient to create a genuine factual dispute in light of the employer's overwhelming

evidence to the contrary and held that the plaintiff's physical attendance at the administration center was an essential function of the service coordinator position.  *Id*. at 1120-22.  In so holding, the Circuit again emphasized its reluctance to second guess the employer's business judgment. *Id*. at 1121-22.

Here, defendant has put forth substantial evidence supporting its contention that physical attendance at the Overland Park office is an essential function of plaintiff's job.  Mr. Ihde testified that in his 30 years of experience he had never permitted anyone to work from home on a permanent basis and he would not authorize it in the context of a small office like the Overland Park office because harmony, camaraderie and teamwork among the individuals in the office were essential to supporting the relationship with Sprint.  He further testified that it would be disruptive and would create morale issues to permit one individual to work from home while requiring others to work in the office.  With respect to plaintiff, Mr. Ihde testified that she was required to interact with other employees in the office on a regular basis and that her responsibilities with respect to Sprint intertwined with the responsibilities of other employees in the office.  Both Ms. Compton and Ms. Felgenhauer agreed with Mr. Ihde's assessment concerning the daily interaction of employees in the Overland Park office and further testified that plaintiff could not be adequately supervised if she was not working in the office–a particular concern in light of plaintiff's performance issues, which required her to be more closely monitored.  In that regard, Ms. Compton testified that plaintiff was not a self-starter and was not proactive in communications or initiating projects.

In response, plaintiff asserts that physical attendance in the Overland Park office was not

18

an essential function of her job.  According to plaintiff, she performed the same job while working out of the Pasadena office and, thus, could just as easily have performed the job from home.

The record evidence, however, does not support this contention.  Plaintiff testified in her deposition that she took on several additional responsibilities when she moved to the Overland Park office and she does not dispute that her job was in jeopardy prior to her move to Overland Park because of performance-related issues that Ms. Compton had observed.  Plaintiff also represents that Ms. Compton admitted that daily interaction with the Overland Park employees was not necessary for plaintiff to perform her job duties and that, instead, she was required to interact primarily with employees in the Pasadena office and Sprint employees.  In support of this assertion, plaintiff refers the court to page 53 of Ms. Compton's deposition, but this page is not a part of the record.  The record does reveal, however, that Ms. Compton testified that plaintiff's job duties interfaced with those of other Overland Park employees.  Plaintiff herself testified that she did not perceive her job as interacting with other employees "unless they needed something" from her.  By her own admission, then, other employees in the office looked to plaintiff for assistance in fulfilling their job responsibilities.  In any event, plaintiff's argument that her job did not "require" her to interact on a daily basis with other employees in the office fails to address defendant's concern about morale in the office if plaintiff was permitted to work from home and fails to address defendant's desire for a sense of teamwork and camaraderie among the employees in the office.

Plaintiff also points to the fact that defendant inquired about plaintiff working from the Sprint facility as evidence that she did not have to be physically present in the Overland Park office

to do her job.  This argument fails for two reasons.  First, defendant did not agree to permit plaintiff to work at Sprint; they simply inquired about the possibility at plaintiff's request.  Second, even if defendant had agreed to permit plaintiff to work at the Sprint facility, that arrangement is dramatically different in substance from permitting plaintiff to work at home.  Presumably, plaintiff would have been interacting with Sprint employees and working under some degree of supervision in that environment.  Similarly, plaintiff highlights that defendant permitted her to work from home on a temporary basis in August 2004 as evidence that her presence in the office was not an essential function of her position.  This argument, too, is rejected.  *See Martin v. State of Kansas,* 190 F.3d 1120, 1133 (10th Cir. 1999) (ADA does not require employers to convert temporary reassignments into permanent ones), *overruled on other grounds*, *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001)).

Finally, plaintiff points to evidence that defendant permitted Stephanie Hyde, an employee in defendant's Pasadena office, to work from home several days each week as support for her contention that physical attendance at the office was not an essential function of her position.  In that regard, Ms. Compton testified that she recommended that Ms. Hyde be permitted to work from home on a trial basis because Ms. Hyde's work performance was "exemplary" and because Ms. Hyde had the "ability to do her job in a working from home atmosphere environment."   Mr. Ihde concurred that Ms. Hyde's position did not require her to be in the Pasadena office and that, in any event, he did not permit Ms. Hyde to telecommute on a full-time basis as she was still required to come to the office every week.  Plaintiff directs the court to no evidence explaining the nature of Ms. Hyde's job responsibilities or controverting defendant's evidence that Ms.

Hyde's job did not require Ms. Hyde's physical attendance in the Pasadena office. Moreover, plaintiff's attempt to compare herself to Ms. Hyde does not address defendant's concerns about plaintiff's performance, the morale of the Overland Park office or the necessity of fostering teamwork and camaraderie in the Overland Park office.

Plaintiff's evidence, then, is insufficient to create a triable issue on whether her physical attendance at the Overland Park office was an essential function of her position. Because plaintiff admittedly refuses to fulfill this function, the court turns to the issue of whether defendant could reasonably accommodate plaintiff. By her own admission, the only accommodation to which plaintiff would have agreed was working from home on a permanent basis. As the Tenth Circuit has repeatedly held, however, "an employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." *Mason*, 357 F.3d at 1122 (citing cases). In *Mason*, the Circuit reviewed decisions from several other circuits holding that an employee's request for a work-from-home accommodation is unreasonable under the ADA. *Id*. at 1123 (collecting cases). Ultimately, the Circuit agreed with those decisions, recognizing that a "request to work at home is unreasonable if it eliminates an essential function of the job," but left the door open for the unusual case in which an employee presents evidence that he or she could perform the essential functions of her position at home. *See id.* at 1124. This is not the unusual case. As explained above, plaintiff has not presented a triable issue on whether physical attendance is an essential function of her job and, thus, her request is unreasonable on its face. Summary judgment in favor of defendant is appropriate on this claim. *See id.* (holding that at-home accommodation was unreasonable because it sought to

eliminate essential function of attendance at the office).

## IV.    Retaliation Claims

In the pretrial order, plaintiff claims that defendant retaliated against plaintiff for requesting an accommodation and hiring an attorney to assist her by requiring her to return to the workplace while knowing that plaintiff, if she did return to work, would suffer "increased pain" from the effect that the stress would have on her fibromyalgia and by requiring her to report to Ms. Fennell who, according to plaintiff, had "preconceived derogatory notions" about plaintiff.    Defendant moves for summary judgment on these claims on the grounds that plaintiff has failed to establish a prima facie case of retaliation.   The court agrees and grants the motion.

As plaintiff has no direct evidence of retaliation, her claims are analyzed using the basic allocation of burdens set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1212 (10th Cir. 2003).    Under the *McDonnell Douglas* framework, plaintiff has the initial burden of establishing a prima facie case of retaliation, which requires her to show that she engaged in protected opposition to discrimination; she suffered an adverse employment action; and there is a causal connection between the protected activity and the adverse employment action.  *See id.*  If she establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision.  *See id.*  If defendant offers a legitimate, nondiscriminatory reason for its actions, the burden reverts to plaintiff to show that defendant's proffered reason was a pretext for retaliation. *See id.*

In support of its motion for summary judgment, defendant first contends that plaintiff has not shown that she suffered any adverse employment actions.  According to plaintiff, she suffered an adverse employment action when defendant demanded that plaintiff report back to the office to work in August 2004 knowing that plaintiff would suffer increased pain by returning to work. This argument is foreclosed by the court's resolution of plaintiff's failure-to-accommodate claim. That is, defendant, by demanding that plaintiff perform the essential functions of her job (working at the office) and refusing to provide an accommodation demanded by plaintiff that is unreasonable as a matter of law (permitting plaintiff to work from home), cannot be deemed to have taken an "adverse employment action" against plaintiff.  *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 939 (10th Cir. 2005) ("Not everything that makes an employee unhappy qualifies as retaliation."); *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004) (Although the Circuit liberally construes the phrase adverse employment action, the action must amount to a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or causing a significant change in benefits.").  Summary judgment on this claim, then, is appropriate.

Plaintiff also alleges that she suffered an adverse employment action when defendant demanded that she report to Ms. Fennell because Ms. Fennell had "preconceived derogatory notions" about plaintiff.  Specifically, plaintiff references an e-mail authored by Ms. Fennell and sent to Mr. Ihde on August 12, 2004 in which Ms. Fennell offered her opinion on the "environment" of the Overland Park office.  In that e-mail, Ms. Fennell stated:

The only problem with the office is that [plaintiff] doesn't work very hard and

23

> doesn't do much for us.  There isn't a single person that she supports (in Kansas
> City or Pasadena) that would actually say they have been helped by [plaintiff] or that
> could even tell you what she is supposd to do.  What little I ask her for I never get.

According to plaintiff, then, defendant's demand that she report to Ms. Fennell adversely affected her potential to receive a promotion and a performance-linked salary increase.  Even assuming defendant's conduct rises to the level of an adverse employment action, plaintiff's claim fails because, as defendant contends, no reasonable jury could find a causal connection between any protected activity and defendant's decision to have plaintiff report to Ms. Fennell.

Plaintiff first requested accommodations for her fibromyalgia (including working from home) during the July 8, 2004 meeting in Pasadena.  Over the next six weeks, defendant proposed a variety of accommodations, including reporting to Mr. Salinger, a reporting relationship that she rejected (despite her admission that it was "really great" working with Mr. Salinger because people like him "made it worth it") solely because she would still be working in the same office as Ms. Compton.  Even after plaintiff's counsel contacted defendant, defendant continued to offer plaintiff a variety of accommodations, all of which plaintiff rejected.  On August 19, 2004, Mr. Slovensky wrote a letter to plaintiff's counsel in which he reiterated defendant's previous proposal that plaintiff report to Mr. Salinger and confirmed plaintiff's rejection of that proposal.  Mr. Slovensky then proposed that plaintiff report to Ms. Fennell.  Significantly, there is simply no evidence that Mr. Slovensky had any knowledge of the e-mail written by Ms. Fennell concerning plaintiff's performance such that he would have had any sense that plaintiff might perceive this reporting relationship as "adverse" to plaintiff.

In short, the record reflects that defendant requested that plaintiff return to work and begin

24

reporting to Ms. Fennell only after plaintiff had rejected all other alternatives, including reporting

to Mr. Salinger, with whom she admittedly enjoyed working.   Defendant's request, then, was

simply the next logical step in the interactive process that started on July 8, 2004.  *See Clark*

*County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("[A] proceeding along lines previously

contemplated, though not yet definitely determined, is no evidence whatsoever of causality.").   In

such circumstances, no reasonable jury could conclude that defendant's request that plaintiff

report to Ms. Fennell was causally connected to plaintiff's request for an accommodation or

plaintiff's decision to hire an attorney.  Summary judgment is granted on this claim.


**V.      Constructive Discharge Claim**

Plaintiff also claims that she was constructively discharged from her employment with

defendant.   A constructive discharge occurs when "an employer, through unlawful acts, makes

working conditions so intolerable that a reasonable person in the employee's position would feel

forced to resign."  *Exum v. U.S. Olympic Committee*, 289 F.3d 1130, 1135 (10th Cir. 2004)

(citing *Pennsylvania State Police v. Suders*, 124 S. Ct. 2342, 2351 (2004)).   Because the court

has concluded that defendant did not commit any "unlawful acts" and is entitled to summary

judgment on plaintiff's discrimination and retaliation claims, the court must grant summary

judgment in favor of defendant on plaintiff's constructive discharge claim.  *See Jones v. Barnhart*,

349 F.3d 1260, 1270 (10th Cir. 2003) (in light of conclusion that employer did not violate Title

VII, court could not conclude that plaintiff was subjected to constructive discharge).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion to dismiss and for summary judgment (doc. 48) is **granted**.   Plaintiff's claim that defendant failed to accommodate her disability by refusing to provide her a cell phone and Blackberry is dismissed for lack of subject matter jurisdiction and summary judgment in favor of defendant is entered on all other claims.


**IT IS SO ORDERED.**


Dated this 23rd  day of January, 2006, at Kansas City, Kansas.


                                                        s/ John W. Lungstrum
                                                        John W. Lungstrum
                                                        United States District Judge

26